**Theodore ROSENTHAL**

v.

**Robert ROSENTHAL et al.**

Supreme Judicial Court of Maine.

Argued March 10, 1988.
Decided May 25, 1988.

William D. Robitzek (orally), Paul F. Macri, Berman, Simmons & Goldberg, Lewiston, for plaintiff.

U. Charles Remmel, II (orally), Kelly, Remmel & Zimmerman, Portland, for Rona Rosenthal.

Gerald F. Petruccelli (orally), Petruccelli, Cohen, Erler & Cox, Portland, for Robert Rosenthal.

Albert L. Bernier, Marden, Dubord, Bernier & Stevens, Waterville, for defendants.

Before McKUSICK, C.J., and
NICHOLS, ROBERTS, GLASSMAN,
SCOLNIK and CLIFFORD, JJ.

McKUSICK, Chief Justice.

In the context of a family dispute arising out of the sale to other family members by plaintiff Theodore Rosenthal of his interests in the Rosenthal family businesses, we are called upon to address the scope and character of the fiduciary obligations that plaintiff contends were violated by his brother Robert Rosenthal and Robert's wife Rona, the defendants in this case.[1] Pursuant to a special jury verdict the Superior Court (Kennebec County) entered judgment for plaintiff on certain of his claims and awarded him damages in the amount of $2,800,001. Because of reversible errors in the presiding justice's jury instructions, we vacate the judgment and remand for a new trial.

## I.

Lewis Rosenthal, the patriarch of the Rosenthal family, established over the course of 60 years a large real estate and business complex in and about Maine. Beginning in the mid–1950s his sons, Robert and Theodore, assisted in the development of the family's many enterprises. Theodore began working with his father after high school and a stint in the military. Robert went on to Colby College and Harvard Business School before he started working in the family business.[2] The family began its business dealings in textiles, but with the decline of that industry in Maine branched out into real estate and the ownership and operation of shopping malls and hotels.

Some of the complexity of this case arises out of the manner in which the Rosenthals established and operated their business. They created a considerable number of closely held corporations, generally completely owned by family members. The most successful of their corporations was Bo-ed, Inc., which owned and operated the Holiday Inn at Cooks Corner in Brunswick. Lewis played no direct role in that business—Theodore and Robert each held a 50% interest in its 100 shares of stock until 1972 when Robert transferred one share to his wife Rona. Thereafter Bo-ed's three shareholders constituted its board of directors comprised its board of directors. The family also owned extensive real estate, which they placed in trusts, with some family members serving as trustees, and others, including grandchildren, being beneficiaries. The family corporations then leased real estate from those trusts. To assist with the overall organization and management of the family's business concerns, one of its corporations acted as a management company. It paid salaries to family members for work they performed in any of the family businesses and also billed the individual entities for services provided them by the other family businesses. The Rosenthals maintained a longstanding policy of intercompany loans, through which the more successful operations would loan money as needed to less successful entities. This flow of money allowed the various business units to expand when opportunities arose, in keeping with the family's longstanding policy of maximum business growth through extensive borrowing against their real estate. Little money was paid out to the family in the form of profits.

In the summer of 1975, after Theodore returned to Maine from a stay in Florida, the brothers began to disagree sharply about the proper financial policies for the Rosenthal business. As a result, the family members entered into an agreement in November 1976 that attempted to set forth a policy on reinvestment and payment of profits that would please all of the principal actors. That agreement, however, failed to resolve the growing controversy between Robert and Theodore. The events immediately precipitating the dispute be-

---

1. Plaintiff dismissed at trial his claims against Bo-ed, Inc., a Rosenthal corporation also originally named as a defendant in the action.

2. Other members of the Rosenthal family also played various roles in the family business, but Lewis, Robert, and Theodore were the principal actors during the relevant period at issue in this case.

fore us unfolded in 1978 when Theodore, who was then in charge of the operations of Bo-ed, Inc., became concerned about the payment of his 1977 and 1978 federal income taxes that arose out of profits attributed to him from the Rosenthal businesses. In circumstances sharply disputed by the parties at trial, Theodore borrowed, at Robert's urging, money from a bank to pay his 1977 taxes. Shortly thereafter, Theodore on his own drew $105,000 as a loan from Bo-ed, for the purpose of covering his earlier personal bank loan and paying his future taxes. In response to Theodore's action, Robert and Rona at a Bo-ed directors meeting in August 1978 voted to require two signatures instead of one on all future Bo-ed checks and to compel Theodore to repay the money he had withdrawn from Bo-ed.

Those disagreements over the family's business policies, brought to a head by Robert's and Rona's activities in 1978 as Bo-ed directors, led Theodore to decide to sell his entire interest in the Rosenthal enterprises. After complex negotiations between Theodore and the other family members involved in business operations, and with both sides fully represented by counsel, Theodore on March 31, 1979, agreed to sell to the family his full interest in all the Rosenthal businesses in exchange for cash payments and other benefits, including the family's commitment to pay all of Theodore's taxes arising out of the transaction. The total consideration received by Theodore under the agreement was estimated to amount to about $1.4 million. The letter of counsel memorializing the March 31, 1979, agreement also stated:

> The obligations which [Theodore] has to any of the Rosenthal enterprises or to any Rosenthal family member will be herewith discharged as of this date except for obligations which arise as a result of this arrangement. The obligations which [Robert] has to [Theodore] will be terminated and discharged as of this date except for those which arise hereunder.

In 1983, with some dispute remaining about whether the family had fully paid all of Theodore's tax liabilities arising from the 1979 sale, Theodore filed the multi-count suit now before us. The parties tried three claims to the jury: that Robert had wrongfully interfered with Theodore's advantageous business relations in the family enterprises, that he had violated a confidential relationship with Theodore, and that Robert and Rona had violated their fiduciary obligations to Theodore in the context of the Rosenthal family businesses. In his brief to this court, however, Theodore has described as the "true crux" of his case against Robert and Rona that through their breach of fiduciary obligations to him "he was improperly forced out of the family businesses and that he sold his share of those businesses at an unfairly low price." During trial Theodore abandoned any claim to be reinstated in the family businesses. In defending against the suit, Robert and Rona both contended not only that their conduct had not been wrongful, but also that the March 1979 agreement constituted a full accord and satisfaction of all the claims Theodore was asserting.

After a three-week trial, the jury found specially that the agreement did not constitute an accord and satisfaction, that Robert and Rona had violated their fiduciary obligations toward Theodore, and that Robert had abused a confidential relationship with Theodore. The jury held against Theodore on his count for wrongful interference with advantageous business relations by finding that he suffered no damages therefrom. On his successful claims, the jury awarded Theodore $2,800,001 in damages.

## II.

Of the three claims tried to the jury, the jury's special verdict adverse to plaintiff finally disposed of one, and our review on appeal finally disposes of a second claim. On the third, an error in instructions necessitates remand of the case for retrial of that single claim. More specifically, the jury itself rejected Theodore's claim of damage from Robert's wrongful interference with his advantageous business relations, and because the evidence of record does not provide rational support for the

jury's finding that a confidential relationship in fact existed between Robert and Theodore at the relevant period of time, we reject on appeal the jury's verdict that Robert violated such a relationship. Thus Theodore's only remaining claim is that Robert and Rona violated the fiduciary duties they owed Theodore as a business associate, thereby wrongfully forcing him to sell out at an unfairly low price. On that sole remaining claim, an erroneous instruction on the business judgment rule requires that we vacate the jury's finding for Theodore and remand for retrial of that one claim.

### A. Rejected Claims

Plaintiff took nothing at trial on the claim for wrongful interference with advantageous business relations. Although the jury found liability against Robert, it nonetheless disposed of that claim in his favor by finding no damages had accrued to Theodore from that wrongful conduct. Since Theodore has not cross-appealed from the judgment that reflected that adverse verdict, that judgment has become final.

To establish that Robert violated a confidential relationship with Theodore in the operation of the Rosenthal family enterprise, Theodore had to show "the actual placing of trust and confidence in fact by [him] in [Robert] and a great disparity of position and influence between the parties to the relation." *Ruebsamen v. Maddocks*, 340 A.2d 31, 35 (Me.1975). Once a plaintiff establishes the existence of that relationship of trust and reliance by one party and dominance by the other, equity then "raises a presumption of undue influence and casts upon [the dominant] party the burden ... to show affirmatively [in the particular transaction] ... entire fairness on his part and freedom of the other from undue influence." *Id.* at 36 (quoting *Eldridge v. May*, 129 Me. 112, 116, 150 A. 378, 379 (1930)).

■ Because we find no evidence in the record that would allow the jury rationally to find as an initial matter that during the years immediately preceding the 1979 sale of his interest in the family enterprise, Theodore in fact had placed trust and reliance in his brother, we vacate the jury's findings that a confidential relationship existed and had been violated. *See Harmon v. Emerson*, 425 A.2d 978, 982 (Me.1981). According to Theodore's own testimony, after he returned from Florida in June 1975 he found himself "in constant conflict" with his brother. Theodore stated that at that time "[Robert] really all of a sudden became a completely different person than I had known before, and would stop me from doing anything." In the summer of 1975 the two "had a very big argument" resulting in Theodore's insistence that he run Bo-ed, Inc. and the Holiday Inn at Cooks Corner. In 1976 he hired a Boston lawyer to negotiate the family agreement that Theodore believed was necessary to lessen his brother's control of the businesses. In 1977 he began refusing to pay bills sent by his brother to Bo-ed, and hired a local lawyer who represented him through the completion of the March 1979 sale "with respect to differences [Theodore] had in his business relationship with other members of his family." Extensive testimony therefore clearly established both that during the four years leading up to the disputed sale of Theodore's interests in the family businesses he and his brother were almost constantly in disagreement over the family business policies, and also that at least since 1977 Theodore was represented by counsel in his negotiations with other members of the family. On such evidence a jury could not rationally find that a confidential relationship existed between Theodore and Robert at any time relevant to the occurrences disputed in this case. Accordingly, on that claim of Theodore, Robert is entitled to judgment.

### B. Violation of Fiduciary Obligations

On the one and only claim remaining in the case, Theodore contends that Robert and Rona violated the fiduciary duties they owed to him as a consequence of their joint engagement in the Rosenthal business enterprises. Through that wrongful conduct, Theodore continues, "he was improperly forced out of the family businesses and ...

sold his share of those businesses at an unfairly low price."

Against that remaining claim that they wrongfully froze Theodore out of the family enterprises, defendants raise a number of objections concerning the presiding justice's jury instructions on the general fiduciary obligations owed to each other by Robert, Rona, and Theodore in the context of their dealings in the Rosenthal business complex. The presiding justice set forth the following four specific fiduciary duties owed by the business associates to each other:

> (1) To act with that degree of diligence, care and skill which ordinarily prudent persons would exercise under similar circumstances in like positions;

> (2) To discharge the duties affecting their relationship in good faith with a view to furthering the interests of one another as to the matters within the scope of the relationship;

> (3) To disclose and not withhold from one another relevant information affecting the status and affairs of the relationship;

> (4) To not use their position, influence or knowledge respecting the affairs and organization that are subject to the relationship to gain any special privilege or advantage over the other person or persons involved in the relationship.

This delineation of fiduciary obligations reflects accurately the duties of care and loyalty owed under Maine law by a corporate director to the corporation and its shareholders, as well as the duties of a partner to the partnership and his fellow partners. *See* 13-A M.R.S.A. § 716 (Supp. 1987);[3] 31 M.R.S.A. §§ 301, 302 (1978); *Gay v. Gay's Super Markets, Inc.*, 343 A.2d 577, 578-79 (Me.1975); *Simpson v. Richmond Worsted Spinning Co.*, 128 Me. 22, 31, 145 A. 250, 254 (1929).

For the first time on appeal defendants object to the presiding justice's definition of the scope of the Rosenthals' duties as including "furthering the interests *of one another*," rather than being restricted to furthering the interests of the business enterprise. We can find no clear error in that instruction, however, given the special nature of the Rosenthal family business, which most closely resembles a single complex family partnership doing business through numerous entities of varied legal forms. *Cf. Dalton v. Austin*, 432 A.2d 774, 777 (Me.1981) ("existence of partnership is an inference of law based on established facts"); *Atlantic Acoustical & Insulation Co. v. Moreira*, 348 A.2d 263, 267 (Me.1975) (fiduciary relationship of corporate directors "takes on meaning and significance only in a particularized factual context"). The duties owed in the circumstances here presented necessarily flowed to the other business associates, as well as to the Rosenthal enterprise as a whole and the component entities.

Defendants also object to the presiding justice's instruction on the weight the jury, in determining whether defendants had violated their fiduciary obligations, should give to the reasoned exercise of business judgment by Robert and Rona. They contend that the instruction on the business judgment rule was inadequate in stating the role of that rule in protecting particular business decisions from being violations of the fiduciary obligations of those who made them. The justice instructed on that rule as follows:

> Now, in consideration of these issues, recognize that disagreement with procedures or results is not enough to demonstrate a violation of fiduciary duty. *If good faith and prudent business judgment* is applied to decisions made in operation of a business, then disagreement

---

**3.** The legislature has stated the fiduciary obligations of corporate directors and officers in relevant part as follows:

> The directors and officers of a corporation shall exercise their powers and discharge their duties in good faith with a view to the interests of the corporation and of the shareholders and with that degree of diligence, care

and skill which ordinarily prudent men would exercise under similar circumstances in like positions. In discharging their duties, directors and officers may in all cases rely upon financial statements of the corporation to the extent provided in [13-A M.R.S.A. § 720(4) ].

13-A M.R.S.A. § 716 (Supp.1987).

with results, or application of hindsight to suggest a different action should have been taken, is not a basis for complaint, *absent violation of one or more of the [four specific] fiduciary duties I've already discussed in this instruction.*

(Emphasis added) We agree with defendants that this instruction so significantly misstates the business judgment rule as to require us to vacate the jury's special finding that Robert and Rona violated their fiduciary obligations to Theodore. Having already stated that defendants owed Theodore four specific fiduciary duties, including the duty of due care, the presiding justice told the jury that the business judgment rule would come into play *only* if defendants had not otherwise violated the duty of due care. Thus the justice left open to the jury to find a breach of fiduciary duty by defendants on a showing merely that they had failed "[t]o act with that degree of diligence, care and skill which ordinarily prudent persons would exercise under similar circumstances in like positions." That is not the law.

Many courts, including our own, have long recognized that it falls outside the proper judicial domain to inquire into and second-guess the prudence of particular business decisions honestly reached by those entrusted with the authority to determine what course of action best advances the well-being of the enterprise. *See Gay v. Gay's Super Markets, Inc.,* 343 A.2d at 580 (quoting *Bates Street Shirt Co. v. Waite,* 130 Me. 352, 359, 156 A. 293, 298 (1931)). *See also Radol v. Thomas,* 772 F.2d 244, 257 (6th Cir.1985), *cert. denied,* 477 U.S. 903, 106 S.Ct. 3272, 91 L.Ed.2d 562 (1986); *Norlin Corp. v. Rooney, Pace Inc.,* 744 F.2d 255, 264 (2d Cir.1984); *Auerbach v. Bennett,* 47 N.Y.2d 619, 629, 393 N.E.2d 994, 1000, 419 N.Y.S.2d 920, 926 (1979). In the last-cited case the New York Court of Appeals explained:

> Questions of policy of management, expediency of contracts or action, adequacy of consideration, lawful appropriation of corporate funds to advance corporate interests, are left solely to [the directors'] honest and unselfish decision, for their powers therein are without limitation and free from restraint, and the exercise of them for the common and general interests of the corporation may not be questioned, although the results show that what they did was unwise or inexpedient.

*Id.* (quoting *Pollitz v. Wabash R.R.,* 207 N.Y. 113, 124, 100 N.E. 721, 724 (1912)).

■ The business judgment rule does not, however, protect business decisions that result from fraud or bad faith. *See Gay v. Gay's Super Markets, Inc.,* 343 A.2d at 580. *See also Radol v. Thomas,* 772 F.2d at 257; *Norlin Corp. v. Rooney, Pace Inc.,* 744 F.2d at 265; *Panter v. Marshall Field & Co.,* 646 F.2d 271, 293 (7th Cir.), *cert. denied,* 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981); *Treadway Companies, Inc. v. Care Corp.,* 638 F.2d 357, 382 (2d Cir.1980); *Auerbach v. Bennett,* 47 N.Y.2d at 631, 393 N.E.2d at 1000, 419 N.Y.S.2d at 927. *See also Principles of Corporate Governance: Analysis and Recommendations* pt. IV, introductory note at 4–5 (Tent. Draft No. 4 1985). The policy reasons for keeping a court from evaluating after the fact the wisdom of a particular business decision do not apply when the issue is whether a party to that decision acted fraudulently or in bad faith. The assessment of fraud or bad faith is a function courts are accustomed to perform, and in performing it the courts do not intrude upon the process of business decisionmaking beyond assuring that those decisions are not improperly motivated.

Thus the business judgment rule will insulate from a finding of liability the informed business decisions made by Robert and Rona unless Theodore is able to show that their allegedly harmful conduct was primarily motivated by fraud or bad faith. As we stated in *Gay v. Gay's Super Markets, Inc.,* 343 A.2d at 581:

> In short, the plaintiff had to prove to the satisfaction of the Court below that *the factual circumstances which caused him to charge the board of directors with bad faith and abuse of discretion were the motivating factors behind the board's policy* of no dividend in enhancement of their personal interests *rather*

*than the promotion of the corporation's welfare.*

(Emphasis added) The Third Circuit, after having recognized that "by the very nature of corporate life a director has a certain amount of self-interest in everything he does," stated the plaintiff's burden in a manner similar to our *Gay* opinion:

> Because the rule presumes that business judgment was exercised, the plaintiff must make a showing from which a factfinder might infer that *impermissible motives predominated* in the making of the decision in question.

*Johnson v. Trueblood,* 629 F.2d 287, 292 (3d Cir.1980), *cert. denied,* 450 U.S. 999, 101 S.Ct. 1704, 68 L.Ed.2d 200 (1981) (emphasis added). *See also Treco, Inc. v. Land of Lincoln Savings and Loan,* 749 F.2d 374, 379 (7th Cir.1984). In the absence of a showing that defendants acted primarily through bad faith or fraud, the business judgment rule prevents a finding that defendants violated their fiduciary obligations to Theodore. *See Radol v. Thomas,* 772 F.2d at 257–58; *Principles of Corporate Governance: Analysis and Recommendations* pt. IV, § 4.01, at 11.

The jury instruction in this case did not give Robert and Rona the benefit of the business judgment rule to which by law they are entitled. It erroneously permitted the jury to assess the ordinary prudence of defendants' business decisions, a function denied to judicial tribunals. The jury should have been told that for it to conclude that defendants in fact violated their fiduciary obligations toward Theodore, it must find that the predominating motive for their conduct was fraud or bad faith. Because the instruction "failed sufficiently to inform the jury correctly and fairly in all necessary respects of the governing law, and ... resulted in prejudice to the complaining party," we vacate the jury's special finding that defendants violated their fiduciary duties toward Theodore. *See Eckenrode v. Heritage Management Corp.,* 480 A.2d at 763.

### III.

Since the case must go back to the Superior Court for a retrial on the one remaining claim that Robert and Rona wrongfully froze Theodore out of the family businesses, it is desirable that we address here two issues that will surely arise during that retrial. *See Woolley v. Henderson,* 418 A.2d 1123, 1128 (Me.1980). For the guidance of court and counsel on retrial, we rule that defendants were entitled to an instruction on the "substituted contract" theory of their affirmative defense of accord and satisfaction. Furthermore, if on retrial plaintiff succeeds in establishing liability on his sole surviving claim, he is entitled to recover in damages only the amount by which he was wrongfully shortchanged when he sold his interests in the Rosenthal businesses for less than they were worth, with interest from March 31, 1979.

### A. *Accord and Satisfaction*

■ To establish the affirmative defense of accord and satisfaction,

> there must be an offer in full satisfaction of the obligation, accompanied by such acts and declarations as amount to a condition that if it is accepted, it is to be in full satisfaction, and the condition must be such that the party to whom the offer is made is bound to understand that if he accepts it, he does so subject to the conditions imposed.

*Pettengill v. Turo,* 159 Me. 350, 361–62, 193 A.2d 367, 374 (1963) (quoting 1 Am.Jur. 2d *Accord and Satisfaction* § 1 (1962)). To find an accord and satisfaction in the case at bar, therefore, the jury must determine as a matter of fact that there was a meeting of the minds between the parties that as part of the March 1979 transaction Theodore released and discharged Robert and Rona from the specific claim now in suit, namely, that in that transaction he was wrongfully forced to sell out at an inadequate price as a result of their breach of their fiduciary obligations to him. The parties' intent is a heavily fact-bound question which the jury must decide upon the evidence presented to it. Absent language in the documentation of the transaction allowing no room for doubt that the parties

intended an accord and satisfaction on the force-out claim, the question as to their intent is properly reserved for the reasoned judgment of the factfinder. *See Emerson v. Sweet*, 432 A.2d 784, 785 (Me.1981); *Wiggin v. Sanborn*, 161 Me. 175, 179, 210 A.2d 38, 39–40 (1965).

■ A party generally can defeat a defense of accord and satisfaction, thereby leaving the underlying obligation intact, by showing simply that the opposing party has failed to carry out his side of the bargained-for accord. *See Emerson v. Sweet*, 432 A.2d at 785. A "substituted contract" theory of the defense, however, provides an exception to the rule requiring full performance by the party asserting the accord. Under that exception, if that party can show that the agreement reached was intended itself to substitute for the underlying claim, then the failure to perform fully the terms of the agreement allows an action only on that substituted contract and not on the underlying claim that was given up in exchange. *See Akerley v. Lammi*, 217 A.2d 396, 397–98 (Me.1966); *Pettengill v. Turo*, 159 Me. at 362, 193 A.2d at 374. Whether the parties intended the agreement as a standard accord and satisfaction or as a substituted contract is a question of the parties' intent, properly reserved to the factfinder. *See Akerley v. Lammi*, 217 A.2d at 398.

■ Over objection the presiding justice refused defendants' request for an instruction on the substituted contract theory of the defense. Because the jury had before it evidence that defendants had failed in their commitment to pay all of Theodore's taxes arising out of the March 1979 transaction, the court erred in refusing to give the requested instruction. We cannot know, of course, whether the jury rejected defendants' affirmative defense because of their failure to pay all the taxes, or simply because the jury was not convinced that the parties ever intended to enter into an accord and satisfaction on the particular claims at issue in the trial. Given the nature of Theodore's principal claim, and the only one now surviving, namely, that Robert and Rona had wrongfully forced

him to enter into the March 1979 agreement and to sell his interests in the family businesses at less than their fair worth, the jury may well have concluded that Theodore could not have had a meeting of minds with defendants to abandon any claim that he had arising out of the inducement of that very forced sale, if such in fact it was. Nevertheless, since we have no way of knowing the jury's reason for rejecting the accord and satisfaction defense, the court's refusal of defendants' request for the "substituted contract" instruction was reversible error.

### B. *Proper Measure of Damages*

■ If plaintiff establishes liability on his sole remaining claim that through a violation of defendants' fiduciary duties "he was improperly forced out of the family businesses and that he sold his share of those businesses at an unfairly low price," he is entitled to recover from the wrongdoers the benefits they unjustly acquired thereby. *See Desfosses v. Notis*, 333 A.2d 83, 87–88 (Me.1975); *Eldridge v. May*, 129 Me. at 116, 150 A. at 379; *Restatement of Restitution* § 3 (1937); D. Dobbs, *Handbook on the Law of Remedies* § 10.2, at 656–57 (1973). The range of restitutionary remedies available to Theodore if successful in proving that he was wrongfully forced out of the Rosenthal enterprises allows him to choose either the return of those business interests wrongfully obtained by defendants from him, conditioned on his repayment of the $1.4 million consideration he received in the 1979 sale, or alternatively a money judgment for the amount defendants wrongfully underpaid him. *See Desfosses v. Notis*, 333 A.2d at 87–88; *Restatement of Restitution* § 4 (1937).

At trial and on appeal plaintiff has made clear that he does not seek rescission of the March 1979 agreement or reinstatement in the family businesses. Rather, in this action he has elected to seek money damages for the wrong he claims was done to him. Such an election of remedies was fully within his rights. *Cf. Harmony Homes Corp. v. Cragg*, 390 A.2d 1033, 1035 (Me. 1978) (party may choose between affirming a contract and seeking damages for its

breach or disaffirming it and pursuing "money had and received"); *Junkins v. Simpson,* 14 Me. 364, 369 (1837) (defrauded seller may treat sale as nullity and reclaim goods or affirm it and claim price). As set forth in the *Restatement of Restitution* § 4 (1937):

> In situations in which a person is entitled to restitution, he is entitled, in an appropriate case, to one or more of the following remedies:
>
> .    .    .    .    .
>
> (c) a decree by a court of equity that the title or possession of the subject matter be transferred to him or that a cause of action or other right be reinstated;
>
> .    .    .    .    .
>
> (f) a judgment at law or decree in equity for the payment of money, directly or by way of a set-off or counterclaim.

Having chosen to affirm the transaction, Theodore has thereby limited his recovery to that value he was shortchanged when he sold his interests for less than they were worth—the difference between the sale price he received and the fair market value on March 31, 1979, of the interests he sold. Absent rescission of the agreement, recovery of that difference, with interest,[4] would fully return to plaintiff the benefits unjustly obtained by defendants through their wrongdoing, if such be proven at retrial. *See Restatement of Restitution* §§ 151, 157 comment b, at 623.

The entry is:

Judgment vacated. Remanded to the Superior Court for entry of judgment for defendant Robert Rosenthal on the claims of violation of a confidential relationship and wrongful interference with advantageous business relations, and for further proceedings on the remaining claim consistent with the opinion herein.

All concurring.

---

4. Plaintiff would also be entitled to interest on the amount owed him by defendants from the time of the March 1979 sale until the time plaintiff obtained a judgment. *See Restatement of Restitution* § 156(c) (1937).